# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| GLORIA LOCKETT, et al., | ) | CASE NO. 5:09CV976 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CITY OF AKRON, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

Before the Court is the motion for summary judgment filed by defendant City of Akron ("the City") (Doc. No. 20), plaintiffs' opposition (Doc. No. 21), and the City's reply (Doc. No. 22), with a manually filed exhibit to the latter (Doc. No. 24). For the reasons discussed below, the motion is **GRANTED**.

## I. BACKGROUND

On March 20, 2009, plaintiffs Gloria Lockett and Edward Turner filed a state court complaint against the City and unknown officers[1] asserting claims for relief under 42 U.S.C. § 1983 for alleged violations of the Fourth and Fourteenth Amendments to the U.S. Constitution, as well as state law claims. An amended complaint (hereafter referred to as "complaint")[2] was filed on March 23, 2009, adding an additional state law claim.[3] The City

---

[1] The City is the sole defendant since the "unknown officers" have never been identified and/or served.

[2] Both the complaint and the amended complaint are located at Doc. No. 1, as exhibits to the removal petition.

[3] The sole federal claim is in Count Two. The state law claims are: negligence (Count One); political subdivision tort liability under O.R.C. Chapter 2744 (Count Three); intentional or reckless and/or negligent infliction of emotional distress (Count Four); and loss of consortium (Count Five).

timely removed the action to this Court on April 28, 2009, having been served with the summons and complaint on April 1, 2009.

Plaintiff Gloria Lockett ("Lockett") is a 65-year-old lifelong resident of Akron, Ohio. (Lockett Dep. at 5-6.)[4] Plaintiff Edward Turner ("Turner") is Lockett's husband. (*Id.* at 11.) Around 7:00 p.m. on March 21, 2007, Lockett was in her apartment on Virginia Avenue in Akron, along with visiting family friends Kenneth Young ("Young"), his wife and their three children. (*Id.* at 16-19, 42.)[5]

The officers involved in this incident have filed affidavits[6] detailing the events of March 21, 2007.[7] They recount that officers from the Akron Police Department's Street Narcotics Uniform Detail ("SNUD") were patrolling an area in Akron known for its drug activity. While checking on a particular residence where three brothers lived who had all been arrested by the SNUD for drugs, they observed a white Chevy Suburban stopped in the middle of the street dropping off several individuals at the residence. One of the occupants, upon exiting the vehicle, saw the police car approaching and leaned back into the vehicle appearing to warn the occupants. The Suburban abruptly drove away, passing the police cruiser as it approached. (Malick Aff. ¶¶ 4-5; Male Aff. ¶¶ 4-5.) One of the officers observed the Suburban, driven by a black male later identified as Hassan Collins ("Collins"), roll through the stop sign and fail to signal as it made a northbound turn. (Carney Aff. ¶5.)

---

[4] Different excerpts of Lockett's deposition are attached to both the motion and the opposition.

[5] Turner was apparently not present in the home at the time.

[6] These unrefuted affidavits are attached to the summary judgment motion (Doc. No. 20) and the reply (Doc. No. 22).

[7] Plaintiffs elected not to conduct any discovery depositions of the officers involved in the events that took place on March 21, 2007 outside and inside Lockett's home. Nor did they conduct any depositions or submit the affidavits of any of the witnesses to these events, including Young. Plaintiffs served one request for production of documents and never objected to the responses they received from the City. They never followed up with a deposition of the record-keeper or any policy-maker; they never followed up with any additional requests. (Reply, Doc. No. 22, at 2.)

The officers followed the Suburban, using lights and sirens and attempting to make a stop. Collins refused to stop until, after an eight-minute high-speed pursuit through residential areas, he finally stopped in front of Lockett's apartment building. SNUD officers, Detective Donnie Williams, Detective Michael Gilbride and Officer Christopher Carney, struggled to arrest Collins, who refused verbal commands. Numerous knee strikes by the officers were also ineffective to bring him down. Sergeant Timothy Givens eventually tasered Collins and Sergeant Jason Malick and Officer Ted Male were then able to handcuff him. (Malick Aff. ¶¶ 6-8; Male Aff. ¶¶ 7-8; Givens Aff. ¶¶ 6; Carney Aff. ¶¶ 5-6.)

Lockett and her guests heard noises coming from outside. Young, his wife, and two of their children went out to investigate. As they left Lockett's apartment through the front door, they left it open behind them. (Lockett Dep. at 43-44, 47.) Lockett, who stood by a chair near the open door, observed what was happening outside. (*Id*. at 47.) She saw SNUD officers subduing and arresting a black male. She also saw a "bunch of kids forming on the other side, like school kids." (*Id*. at 47-48.) The officers testified that people in the crowd, including Young, began shouting at them. (Malick Aff. ¶ 9; Carney Aff. ¶ 8; Givens Aff. ¶ 7.)[8] Lockett heard Young reacting to the fact that a police officer had hit the arrestee, say: "[M]an, ya'll didn't have to do him like that[,]" to which she heard the officer respond: "It ain't none of your business, shut up." (*Id*. at 48.) Malick, however, testified that Young shouted: "You [expletive] are going to kill him like you did that boy over the weekend. Let's get these [expletive] off of him before they kill somebody else." (Malick Aff. ¶ 10.)[9]

---

[8] Malick states that the crowd numbered as many as 200 people; Givens describes it as being between 50 and 100 people.

[9] The reference to killing a boy over the weekend was to the shooting of a 19-year old black male a few days earlier by Akron police. According to plaintiffs, this shooting was "highly controversial and highly publicized" putting

Officers believed Young was inciting the crowd. (Carney Aff. ¶ 8; Givens Aff. ¶ 8.) Malick and Givens ordered him to back away and go back into the house, but Young refused and "continued his tirade, screaming obscenities at the officers." (Malick Aff. ¶ 10; *see also* Carney Aff. ¶ 10; Givens Aff. ¶ 9.) Due to the "increased hostility of the crowd toward [the] officers[,] [Malick] made the decision to have Young arrested." (Malick Aff. ¶ 10; Givens Aff. ¶ 10.)[10]

Givens and other officers approached Young and told him he was under arrest. Rather than submit, he turned and fled toward Lockett's open door. (Malick Aff. ¶ 11; Carney Aff. ¶¶ 10-11; Givens Aff. ¶¶ 10-11.)[11] The officers ran after Young, and Givens grabbed him before he entered Lockett's front door. (Givens Aff. ¶ 11.) Young, however, did not stop; he continued to run, even though Givens never lost his hold. Momentum carried Young and Givens through the door and into Lockett's residence. (Givens Aff. ¶ 11; Malick Aff. ¶12; Carney Aff. ¶ 12.) Carney and Male followed to assist Givens in securing Young. (Carney Aff. ¶ 12; Male Aff. ¶ 9.) Young was tackled onto a chair in Lockett's living room. He resisted the officers but, after Givens delivered three closed-fist strikes to Young's mid-section, Male and Carney were able to handcuff Young. (Givens Aff. 13; Carney Aff. 14.)

---

"police violence and brutality [. . .] at the forefront of the Akron community's collective conscience, particularly Akron's African-American community." (Doc. No. 21, at 9.)

[10] In a unsworn taped interview taken by Sergeant Givens on March 22, 2007, Young admitted that he "almost incited a riot" and that there were at least 50 angry people standing around shouting at the officers. Young further admitted that he should have stayed out of the incident and that he deserved whatever he got. He was extremely apologetic for the trouble he had caused. (Although the defendants did not supply a transcript of this tape recorded interview, the Court listened to it and gleaned this information). *See* Doc. No. 24.

[11] Lockett testified that she called out to Young that he had "better come in here," that Young simply "turned around," and that "they [the police] just rushed him." (Lockett Dep. at 48.) Young, in his unsworn taped statement, said he did not run. Either way, whether he ran or walked, he was not complying with the officers' directives telling him he was under arrest.

When they went into the apartment, the officers were unaware that Lockett was standing near the front door; none took any purposeful action against her. (Malick Aff. ¶ 13; Male Aff. ¶¶ 10- 12; Carney Aff. ¶¶ 15-16; Givens Aff. ¶¶ 14- 15; *see also* Lockett Dep. at 97-98.) She claims, however, to have been pushed by one of the officers, causing her to fall against the arm of her couch and resulting in injury to her hip and back. (Lockett Dep. at 55.) Lockett describes the area where she was standing in her living room as "tight" and admits that she was in the direct path of the officers and that no officer intentionally pushed her down. (*Id.* at 54, 93, 97-98.) The officers recall no physical contact between any of them and Lockett; however, they admit they were very focused on arresting Young and acknowledge that any contact there might have been with Lockett would have been unintended. (Male Aff. ¶ 12-13; Carney Aff. ¶ 17; Givens Aff. ¶16-17.)

Charges were filed against Young in Akron Municipal Court for inciting violence, resisting arrest, disorderly conduct and failure to disperse. After plea negotiations, Young pled guilty to inciting violence and the remaining charges were dismissed. (Hazen Affidavit.)[12]

## II.  DISCUSSION

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c)(2) governs summary judgment motions and provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

---

[12] This affidavit is attached to the motion for summary judgment. It also contains several supporting documents relating to the proceedings against Young. (*See* Doc. No. 20-6.)

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> **(1)** ***In General.*** A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.
>
> **(2)** ***Opposing Party's Obligation to Respond.*** When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F.Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**B.      Analysis**

      **1.      Lockett's Section 1983 Claim (Count Two)**

Title 42, Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

A municipality is considered a "person" within the meaning of § 1983, *Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978), and "may be subject to suit for monetary damages if [it] violate[s] an individual's constitutional rights." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 1000 (6th Cir. 1994). A municipality may be sued under § 1983 if it is "alleged to have caused a constitutional tort through 'a policy statement, ordinance,

7

regulation, or decision officially adopted and promulgated by that body's officers.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (citing *Monell*, 436 U.S. at 690). It may also be liable for constitutional deprivations that result from "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* (citing *Monell*, 436 U.S. at 690-91). The municipality cannot, however, be liable on a theory of *respondeat superior* for violations committed solely by its employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

To establish municipal liability under § 1983, the plaintiffs must show: "1) that [Lockett] was deprived of a constitutional right; 2) that the municipality had a 'policy'; and 3) that the policy was 'the moving force' behind the constitutional violation." *O'Brien*, 23 F.3d at 1000 (citing *Monell*, 436 U.S. at 658).

### a.      Fourth Amendment -- Warrantless Seizure

Plaintiff Lockett claims that the SNUD officers "violated [her] civil and constitutional rights when they entered her residence in a violent, negligent and/or reckless manner, without consent by Plaintiffs, causing Ms. Lockett to incur physical pain and suffering and damages to personal property." (Compl. ¶ 22.) She further alleges that "such manner of entry was in violation of Plaintiffs' rights to be free from unreasonable search and seizure[.]" (Compl. ¶ 23.)

Lockett argues, in opposition to the motion for summary judgment and in support of her claim, that the SNUD officers' warrantless entry into her home in pursuit of Young was unlawful because they had no probable cause to arrest Young. Although it is unlikely that Lockett even has standing to challenge the arrest of a third party, *see, e.g., Ross v. Duggan*, 402 F.3d 575 (6th Cir. 2004) (owner of vehicle lacked standing to challenge the existence of probable

8

cause to arrest her son who was driving the car when it was impounded), Young's arrest *was* lawful. He was charged with inciting violence, disorderly conduct, and failure to disperse. He entered a guilty plea to the charge of inciting violence. This guilty plea is "an implicit admission that the officers had probable cause to arrest him for that charge." *Haupricht v. Sylvania Tp. Police Dep't*, No. 3:06cv2908, 2008 WL 4148597, at * 1 (N.D. Ohio Sept. 4, 2008) (citing *Daubenmire v. City of Columbus*, 507 F.3d 383, 390 (6th Cir. 2007) ("Plaintiffs are estopped by their pleas in state court from now challenging the reasonableness of their arrest in the instant § 1983 action.")); *Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988) (no contest pleas, finding of guilt, and imposition of fines "estop plaintiffs from now asserting in federal court that the defendant police officers acted without probable cause"). Therefore, Lockett's argument that Young's arrest was illegal has no merit, whether or not she has standing to even advance the argument.

Lockett next argues that, even if there was probable cause to arrest Young, the officers' pursuit of Young into her residence without a warrant was unconstitutional. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). However, "an officer is justified in so acting if there are exigent circumstances presented by the facts of the individual case." *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Korman*, 614 F.2d 541, 546 (6th Cir.), *cert. denied*, 446 U.S. 952 (1980)).

In *Jones*, the Sixth Circuit noted that it has "traditionally found exigent circumstances in the following three instances: (1) when the officers were in hot pursuit of a

fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers or the public; and (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Id*. (citing *United States v. Morgan*, 743 F.2d 1158, 1162-63 (6th Cir.1984), *cert. denied*, 471 U.S. 1061 (1985)).

Lockett argues, in reliance on *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996), that the fleeing suspect must be a "fleeing felon." However,

> [t]he United States Supreme Court has held, *without distinguishing between felony and misdemeanor suspects*, that police officers engaged in hot pursuit may follow a suspect into a private residence to complete an arrest begun in a public place. *U.S. v. Santana,* 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). The Court reasoned that "a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under *Watson,* by the expedient of escaping to a private place." *Id.* at 44 (citing *U.S. v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)).

*Haupricht v. Contrada*, No. 3:08cv2961, 2009 WL 5061672, at *3 (N.D. Ohio 2009) (emphasis added). The court in *Haupricht* further noted:

> Applying *Santana*, the Ohio Supreme Court held that police officers who identified themselves and were in hot pursuit of a defendant who fled into a house to avoid arrest for misdemeanor traffic offenses, could enter defendant's house without a warrant to effectuate the arrest.

*Id.* (citing *Middletown v. Flinchum*, 95 Ohio St.3d 43, 45 (2002) (officers could enter without a warrant "regardless of whether the offense for which the suspect is being arrested is a misdemeanor"). Lockett does not deny that there was a "hot pursuit,"[13] only that Young was not

---

[13] Even if she had made that argument, it could not withstand scrutiny under the relevant case law. In *Santana*, the Supreme Court stated:

> The District Court was correct in concluding that "hot pursuit" means some sort of a chase, but it need not be an extended hue and cry "in and about (the) public streets." The fact that the pursuit here ended almost as soon as it began did not render it any the less a "hot pursuit" sufficient to justify the warrantless entry into Santana's house.

*Santana*, 427 U.S. at 42-43.

a fleeing felon. Of course, under the case law just cited, there is no requirement that the fleeing suspect be a felon. Therefore, this argument has no merit.

In this case, the SNUD officers had probable cause to arrest Young based on his inciting and obstructive behavior at the scene of the arrest of Collins. The arrest began in a public place when Young was told he was under arrest; further, Givens actually grabbed Young before he ran into Lockett's home,[14] dragging Givens along. Since the officers were permitted under the Fourth Amendment to enter the residence without a warrant to arrest Young, Lockett cannot prove an unlawful entry into her home.[15]

Finally, with respect to the Fourth Amendment, Lockett argues that she was "seized" when she was "shoved to the ground by Akron police officers as they entered her home." (Doc. No. 21, at 17.) She asserts that "it is very possible and even probable that at least one of the officers saw [her] standing by her door and intentionally shoved her aside in order to get to Mr. Young." (*Id.*) She claims that this is a fact question for a jury to decide.

"To make out a *genuine* issue of material fact, plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her." *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009) (emphasis in original) (citing *Scott v. Harris*, 550 U.S. 372, 380-81(2007)).

Lockett's argument is refuted by the clear evidence in the record. Every one of the officers involved, in their affidavits, have stated that they did not know Lockett was standing

---

[14] Even Lockett testified that "[. . .] when Kenny came into the door, the officers [already] had him." (Lockett Dep. at 53.)

[15] Lockett's argument at p. 11 of her opposition brief that the officers had three other alternatives to warrantless entry (i.e., attempt to obtain consent to enter; obtain an arrest warrant; or wait for Young to leave the home and arrest him then) ignores the clear legal authority presented by the City that a suspect may not defeat an arrest that was set in motion in a public place by retreating to a private place, and that an arresting officer can enter a residence in pursuit of an arrestee to accomplish such an arrest. *Santana*, *supra*; *Haupricht*, *supra*; *Flinchum*, *supra*.

near her door when they followed Young into the residence, that they do not believe there was any contact between any of them and Lockett and, if there was contact, that it was unintended. Lockett chose not to depose any of the officers and, therefore, there is no record evidence to refute these affidavit assertions. Further, Lockett herself testified as follows at her deposition:

> Q.  [by defendant's counsel]
> [I]t is not your position, is it, that an officer who was part of this group broke away from that group of officers and came over and shoved you down? That's not accurate; is that correct?
>
> A.  No, sir. That's not accurate.
>
> Q.  What I understand in listening to your testimony and what I want to make certain is clear is that this group of officers was coming in all at once behind Kenny Young, and in that process one of those officers who was part of that group shoved you down in some form or some fashion?
>
> A.  Yes, sir.
>
> Q.  Okay. As opposed to some individual officer making a decision to stop arresting Kenny Young and come over and push you down, that's not what happened?
>
> A.  No, sir.

(Lockett Dep. at 97-98.) As in *Scott*, 550 U.S. at 381, n.8, this Court's duty to afford the non-moving party the benefit of reasonable inferences does not require it to find a genuine fact issue based on Lockett's unsupported hypothetical that "it is very possible and even probable" that one of the officers intentionally pushed her.

Lockett also argues that even the very Supreme Court case relied upon by the City as support for its position that she was *not* seized "leads to the undeniable conclusion that [she] *was* seized." (Doc. No. 21 at 11, emphasis in original.) In *Brower v. County of Inyo*, 489 U.S. 593 (1989), the petitioner's decedent had been killed when a stolen car he was driving in an

effort to evade police crashed into a police roadblock.[16] The Court held that a seizure had occurred and that the petitioners had sufficiently alleged a right to recover for their decedent's death caused by a roadblock set up in a manner likely to kill him.[17] In reaching this conclusion, the Court noted:

> a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Id.* at 596-97.

The Court also stated that "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control[ ] [and that] [a] seizure occurs even when an unintended person or thing is the object of the detention or taking." *Id*. at 596 (citing *Hill v. California*, 401 U.S. 797, 802-05 (1971)). Lockett relies on this quotation to support her position that "[t]he detention/taking of Mr. Young by the SNUD officers was clearly willful, and if an unintended detention/taking of Mrs. Lockett occurred during the detention/taking of Mr. Young, Mrs. Lockett was undeniably seized." (Doc. No. 21 at 17-18.) Lockett, however, misconstrues *Brower* because, under the facts of this case, she was more like the "innocent passerby" referred to by the Court and she was most certainly not the *object* of the detention or taking.[18]

---

[16] Petitioners in *Brower* argued that respondents had "(1) caused an 18-wheel tractor-trailer to be placed across both lanes of a two-lane highway in the path of Brower's flight, (2) 'effectively concealed' this roadblock by placing it behind a curve and leaving it unilluminated, and (3) positioned a police car, with its headlights on, between Brower's oncoming vehicle and the truck, so that Brower would be 'blinded' on his approach." 489 U.S. at 594 (quoting the petitioners' brief).

[17] The Court, however, directed the court of appeals, on remand, to determine whether the district court had erred in concluding that the roadblock did not effect a seizure that was "unreasonable." 489 U.S. at 599-600.

[18] *Brower* cited *Hill* as an example of the seizure of an "unintended person." In *Hill*, officers had probable cause to arrest Hill for an armed robbery which had occurred the day before. On information given to them by one of Hill's accomplices, they went to Hill's home without an arrest or search warrant. They arrested the man who answered the

13

"[T]he Fourth Amendment addresses 'misuse of power,' [. . .] not the accidental effects of otherwise lawful government conduct." *Brower*, 489 U.S. at 596 (citations omitted). In this case, Lockett was present when the police lawfully entered her home without a warrant to effect the arrest of Young, an arrest which had begun in a public place. Lockett was not "seized" within the meaning of the Fourth Amendment under the teachings of *Brower*.

Accordingly, to the extent Count 2 of the complaint alleges a violation of the Fourth Amendment, the City is entitled to summary judgment.

### b.     Fourteenth Amendment - Liability for Injury to Bystander

As already noted, in paragraph 22 of the amended complaint, Lockett asserts that the entry into her residence "in a violent, negligent and/or reckless manner" caused her "to incur physical pain and suffering and damages to personal property." This is obviously a reference to the fact that she claims she was pushed by one of the officers causing her to fall against the arm of her couch and suffer hip and back injury.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that "*all* claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the

---

door who seemed to fit the accomplice's description of Hill but who, upon their inquiry, told them he was not Hill, that his name was Miller, that it was Hill's apartment, and that he (Miller) knew nothing about any stolen property or guns. Even though Miller produced identification, the police proceeded to search the apartment and seized several items, all of which were later introduced as evidence. Hill was found guilty of robbery on the basis of that evidence because the eyewitnesses to the robbery were unable to identify him. The Court held that the arrest of Miller was not unlawful and that "[i]n these circumstances the police were entitled to do what the law would have allowed them to do if Miller had in fact been Hill, that is, to search incident to arrest and to seize evidence of the crime the police had probable cause to believe Hill had committed." *Hill*, 401 U.S. at 804.

Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id*. at 395.

> However, the Fourth Amendment "reasonableness" standard does not apply to section 1983 claims which seek remuneration for physical injuries *inadvertently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator, because the authorities could not "seize" any person other than one who was a deliberate object of their exertion of force. *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Rather, constitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official "seizure" are adjudged according to substantive due process norms. *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1714-16, 140 L.Ed.2d 1043 (1998).

*Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (emphasis in original).

The "substantive component of the due process clause [of the Fourteenth Amendment] insulates citizens against the arbitrary exercise of governmental power." *Id.* To establish denial of fundamental substantive due process, a plaintiff must show that the defendants' conduct "shocked the conscience." *Lewis*, 523 U.S. 833, 846 (1998). This standard has been clarified by the Sixth Circuit as follows:

> In situations wherein the implicated state, county, or municipal agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action (such as, for example, most occasions whereby corrections officials ignore an inmate's serious medical needs), their actions will be deemed conscience-shocking if they were taken with "deliberate indifference" towards the plaintiff's federally protected rights. [*Lewis*, 523 U.S.] at 1719. In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation (such as, for example, a prison riot), public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline[.]"[12] *Id*. at 1720 (citation omitted).

> > [12]As aptly observed by the *Lewis* Court:
> > > [T]he police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance.

15

> *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1720, 140 L.Ed.2d 1043
> (1998) (citations omitted). *See also Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct.
> 1865, 104 L.Ed.2d 443 (1989) ("police officers are often forced to make split-second
> judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the
> amount of force that is necessary in a particular situation.").

*Claybrook*, 199 F.3d at 359 (footnote in original); *accord*, *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2002) ("[t]he guiding principle seems to be that a deliberate-indifference standard is appropriate in 'settings [that] provide the opportunity for reflection and unhurried judgments,' but that a higher bar may be necessary when opportunities for reasoned deliberation are not present.") (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 n.5 (6th Cir. 2002)).

   Here, the more exacting standard applies. Lockett's argument that the lower standard should apply because "Sergeant Malick had plenty of time to reflect upon whether or not to arrest Mr. Young" (Doc. No. 21 at 19) is without merit. The portion of this factual scenario that is relevant to a choice of standard is not the *officers' decision* to arrest Young; rather, the standard must be chosen in light of *Young's sudden decision* to turn and flee into Lockett's residence after he was told he was under arrest. Lockett argues that this did not turn the situation "fluid and dangerous" as it would have if Young had chosen to attack one of the officers. However, no matter how easy it might be to make that statement in hindsight, at the time these events occurred, the officers had no way of knowing why Young bolted and what he may have had in mind. For all the officers knew, Young may have been running into the residence to get a weapon. Especially in view of the fact that, just before he ran, Young had been inciting the crowd that had gathered,[19] the officers were placed in a position of having to make snap decisions.

---

[19] Lockett's assertion that the crowd was mere "schoolchildren" and, therefore, could pose no threat to the officers is conjecture. Further, there is very little evidence in the record as to the nature of the crowd. The officers have filed affidavits stating that the crowd ranged from 50 to 200 in number and that people were shouting at the officers. The only testimony relating to the age of the bystanders in the crowd was given by Lockett when she stated that "a bunch

There is also no merit to Lockett's assertion that, by deciding to pursue Young when he ran upon being informed he was under arrest, the officers "demonstrated a deliberate indifference to Mrs. Lockett's constitutional rights." (Doc. No. 21 at 19-20.) Although "deliberate indifference" is not the correct standard, every officer has testified by affidavit that he was unaware of Mrs. Lockett's presence; therefore, the officers could not have been "deliberately indifferent" to her, even if that were the standard.

Further, there is simply no basis in the record for Lockett's assertion that "it is not clear that the angry and frustrated officers were not acting for the very purpose of causing harm" and that "[b]efore even deciding to arrest Mr. Young, the officers had already threatened Mr. Young with physical harm of the same nature as that inflicted on Hassan Collins." (*Id.* at 20). The evidence is that Young was screaming obscenities and inciting the crowd and that he would not stop despite being told to back off. (*See,* Malick Aff. ¶¶ 9-10; Carney Aff. ¶¶ 8-9; Givens Aff. ¶¶ 8-9.)[20]

---

of kids was forming on the other side, like school kids." (Lockett Dep. at 47.) The insinuation that these were small children is simply unfounded.

[20] Even Lockett's testimony does not refute that Young was refusing to obey the officers' orders to desist. She testified as follows:

Q.      [by defendant's counsel]
        You could see outside the door?

A.      Uh-huh. And the SNUD man told Kenny to shut up. By that time a bunch of kids was forming on the other side, like school kids.

Q.      Where was Kenny standing when you saw the SNUD officer telling him to shut up?

A.      Kenny had left out of my house, and was on the sidewalk.
        * * *
        And he – he was saying, man, ya'll didn't have to do him like that, because the one officer knocked – they had chased this black guy.
        * * *
        They had chased him from the west side. He had got out of the big white car thing, and was standing – standing up. And then the police officer hit him. And that's when Kenny was saying, man, ya'll didn't have to do him like that. And the SNUD man said, shut up. It ain't none of your business, shut up. And Kenny was saying some words back to him.
        * * *

Even considering the evidence in the light most favor to Lockett, no reasonable jury could conclude that the officers acted with conscience-shocking malice or sadism toward her as a bystander to Young's arrest. Even Lockett's own deposition testimony would support this conclusion.

Accordingly, to the extent Count 2 of the complaint alleges a Fourteenth Amendment substantive due process claim, the City is entitled to summary judgment.

### c.      Conclusion as to Count 2

In summary, because Lockett has failed to show any violation of her constitutional rights under either the Fourth or the Fourteenth Amendment, the Court need not consider the issue of "custom, policy or practice."[21] Defendant City is entitled to summary judgment on Count 2 of the complaint and the same shall be entered.

---

|   |   |
|---|---|
|   | And then I said, Kenny, you better come on in here before they hit – before they beat you up, too. Them was the words that I used. Kenny turned around like – just instantly turned around, and then that's when they rushed him. |
| * * * |   |
| Q. | Okay. How long was Kenny yelling or saying something to these SNUD officers before he turned to come back into the house? |
| A. | He didn't say a lot. I remember him saying, ya'll don't have – ya'll didn't have to do him like that. And I remember the police saying, you better shut up or you'll get done like that or some – before we do something to you or something. They were like arguing back and forth. |

(Lockett Dep. at 47-49.)

[21] In any event, as convincingly argued by the City in both its motion brief and its reply brief, the record simply does not support plaintiffs' assertion in the opposition brief that the Akron Police Department's official policy regarding the use of nondeadly force "may well be illegal in that it condones the use of excessive force to subdue a suspect." (Doc. No. 21 at 14.) In fact, the policy requires that officers "use only that force objectively reasonable to protect life and accomplish their goals." (Doc. No. 22 at 7.) Furthermore, to the extent plaintiffs make any argument at all with respect to custom, policy and practice, it is made solely to challenge the appropriateness of the pursuit of *Collins* and/or the arrest of *Young*, matters which are unassailable and with respect to which plaintiffs do not enjoy standing.

## 2.      State Law Claims

Counts 1, 3 and 4 of the complaint allege state torts.[22] The City argues that these claims all fail because the City is immune from state tort causes of action relating to police functions pursuant to O.R.C. Chapter 2744, the Political Subdivision Tort Liability Act.

O.R.C. § 2744.02(A)(1) provides, in relevant part:

> Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

The issue of whether a political subdivision is entitled to sovereign immunity is a question of law peculiarly suited to summary judgment. *Harris v. Sutton*, 183 Ohio App. 3d 616, 620 (Ohio App. 8 2000). Analysis of the issue is three-tiered. *Cater v. City of Cleveland*, 83 Ohio St.3d 24, 28 (1998). At the first tier, there is a general grant of immunity under O.R.C. § 2744.02(A)(1). At the second tier, the analysis focuses on five exceptions to this immunity set forth in § 2744.02(B). If any of these exceptions apply, the third tier of the analysis evaluates whether any of the defenses in § 2744.03 apply.

There is no question that the City of Akron is a political subdivision and that police functions are governmental functions, entitling the City to the general grant of immunity. O.R.C. § 2744.01(C)(2)(a). Therefore, the Court must turn its attention to the availability of any of the exceptions to immunity.

---

[22] Count 4 states alternative claims for intentional and/or reckless infliction of emotional distress *or* negligent infliction of emotional distress. To the extent this count asserts a claim for intentional or reckless behavior, the City is clearly immune. Section 2744.02(b) provides exceptions to political subdivision liability only for certain *negligent* acts. *See*, *Wilson v. Stark Cty. Dept. of Human Servs.*, 70 Ohio St.3d 450, 452 (1994) ("there are no exceptions to immunity for the intentional torts of fraud and intentional infliction of emotional distress").

The exceptions set forth in § 2744.02(B) include injury, death, or loss to person or property resulting from: (1) the negligent operation of any motor vehicle by an employee during the scope and within the authority of that person's employment; (2) the negligent performance of acts by an employee with respect to proprietary functions of the political subdivision; (3) the negligent failure to keep public roads in repair or to remove obstructions from public roads; (4) the negligence of an employee that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function; or (5) any other situation in which liability is expressly imposed by state statute.

Plaintiffs argue that at least three exceptions apply. First they argue that the police pursuit of Collins constituted negligent operation of a motor vehicle which ultimately caused the incidents at Lockett's residence. Plaintiffs lack standing to challenge the legitimacy of the police pursuit of Collins and, further, it is highly questionable whether that pursuit could be said to have been the *proximate* cause of any injury to plaintiffs. That argument is rejected by the Court.

Second, plaintiffs assert that the case fits under "negligence on the grounds of buildings used to perform a government function." They argue, without pointing to any authority for this proposition, that the SNUD officers negligently used Lockett's home (i.e., a "building") to perform the governmental function of pursuing and arresting Young. Plaintiffs' argument has absolutely no merit because of the exact language of this statutory exception, which states that political subdivisions are liable for injury "that is caused by the negligence of their employees *and* that occurs within or on the grounds of, *and* is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental

function [. . .]." (Emphases added.) Clearly, plaintiffs' argument interprets the statutory exception entirely too broadly.

Third, plaintiffs assert, without supporting argument or legal authority, that this case fits under the "other Revised Code" exception and they point to § 737.11 as the source of the exception. Section 737.11, which deals with the "general duties" of police and fire departments, provides in relevant part:

> The police force of a municipal corporation shall preserve the peace, protect persons and property, and obey and enforce all ordinances of the legislative authority of the municipal corporation, all criminal laws of the state and the United States, all court orders issued and consent agreements [. . .], and protection orders issued by courts of another state [. . .].

However, plaintiffs fail to acknowledge that the "other Revised Code" exception in § 2744.02(B)(4) explicitly states that civil liability under another code section must be "expressly imposed upon the political subdivision" and that "[c]ivil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon a political subdivision [. . .]." Section 737.11 is simply an expression of the general duties of a municipal police department; it does not "expressly impose" liability for failure to carry out those duties. Accordingly, this argument has no merit.[23]

---

[23] The Eighth District Court of Appeals of Ohio has held, with respect to fire departments, that liability is not expressly imposed by § 737.11, for purposes of an exception to immunity under § 2744.02(B). *See State Auto. Mut. Ins. Co. v. Titanium Metals Corp.*, 159 Ohio App.3d 338, 342 (Ohio App. 8 2004) (concluding instead that the lower court's grant of a motion to dismiss was improper where the injured party was able to state a cause of action applying the "special relationship exception" to the public-duty rule). The Ohio Supreme Court reversed the case on procedural grounds, finding that denial of a motion to dismiss for failure to state a claim was not a final appealable order, that the trial court had made no ruling with respect to immunity for the court of appeals to review, and that, therefore, the court of appeals had lacked jurisdiction. The court vacated the judgment "and all conclusions regarding the public-duty doctrine." *State Auto. Mut. Ins. Co. v. Titanium Metals Corp.*, 108 Ohio St. 3d 540, 542 (2006). The Ohio Supreme Court later expressly concluded that the Eighth District had been mistaken in its application of the special relationship exception in the *Titanium Metals* case because that exception is not codified in § 2744.02(B). *See Rankin v. Cuyahoga Cty. Dept. of Children and Family Servs.*, 118 Ohio St.3d 392, 397 (2008). However, neither of these Ohio Supreme Court opinions expressly rejected the ruling of the Eighth District with respect to the use of § 737.11 for immunity purposes under § 2744.02(B); they only rejected its ruling regarding the public-duty doctrine (the court in *Titanium Metals* rejecting it on procedural grounds; and the court in *Rankin*

Because there are no applicable exceptions to the immunity enjoyed by the City, the Court need not consider the third tier of the analysis.

In view of the above discussion, the Court concludes that the City is immune from any liability for the state tort claims in Counts 1, 3, and 4. Therefore, the City is entitled to summary judgment on all of these claims.[24]

### 3.    Loss of Consortium Claim

In Count 5 of the complaint, plaintiff Edward Turner, Lockett's husband, alleges that "[a]s a result of the acts and omissions of Defendants which caused injuries to Ms. Lockett, Mr. Turner no longer has the same love, care, affection, services, society, companionship and compassion as he enjoyed from Ms. Lockett." (Compl. ¶ 36.)

A claim for loss of consortium is derivative and is dependent upon a defendant having committed a cognizable tort upon the spouse of the person making the claim. *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 91 (1992) (citing *Clouston v. Remlinger Oldsmobile Cadillac, Inc.*, 22 Ohio St.2d 65, 74 (1970)). Since there is no cognizable tort against Lockett, Turner's claim cannot stand and the City is entitled to summary judgment on that claim.

---

rejecting it on the merits). Therefore, this Court assumes that, given the chance, the Ohio Supreme Court would reach the conclusion that § 737.11 is not a source for an exception to political subdivision immunity. *See also*, *Steinke v. Wiesenmayer*, 119 Ohio App.3d 171, 175 (Ohio App. 3 1997) (§ 737.11 "simply restates the police department's common law duty to the public" not to any individual); *Zebrasky v. Ohio Dept. of Transp.*, 16 Ohio App.3d 481, 484 (Ohio App. 10 1984) ("[p]olice protection is a duty owed to the public as a whole but not to any individual member").

[24] Relying on *Kammeyer v. City of Sharonville*, 311 F.Supp.2d 653 (S.D. Ohio 2003) and *Butler v. Jordan*, 92 Ohio St.3d 354 (2001),  plaintiffs would have this Court declare § 2744.02 unconstitutional under the Ohio Constitution. However, for the reasons aptly set forth in *Webb v. Greene County Sheriff's Office*, 494 F.Supp.2d 779, 796-97 (S.D. Ohio 2007), the Court finds neither *Kammeyer* nor *Butler* persuasive on this issue.

## III. CONCLUSION

For the reasons discussed above, defendant City of Akron's motion for summary judgment (Doc. No. 20) is **GRANTED**.


**IT IS SO ORDERED**.


Dated: May 19, 2010

                                                                                        
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**